# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. CHARLES HUMPHRIES

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 02-08180, 02-08178     Joseph B. Dailey, Judge**

---

**No. W2005-00016-CCA-R3-CD  - Filed March 7, 2006**

---

The defendant, Charles Humphries, was convicted of first degree premeditated murder and aggravated assault (a Class C felony) and received Range II consecutive sentences of life imprisonment and ten years.  On appeal, he challenges the sufficiency of the evidence to establish the element of premeditation and the imposition of consecutive sentences.  Upon thorough review, we affirm the convictions and sentences of the Shelby County Criminal Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Tony Brayton, Mary Kathryn Kent, and William Robilio, Assistant Public Defenders, for the appellant, Charles Humphries.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jerry Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

At trial, Kandace Hunt testified that she last saw her mother, the victim,[1] alive at her home on September 2, 2002, where the victim was present at a birthday party for her granddaughter.  She stated that the defendant, her stepfather, also attended the party.  Hunt recalled that, following the victim's death, she listened to phone messages left by the defendant on the victim's home phone,

---

[1] Although there are technically two victims in this case, one of aggravated assault (Glenda Gipson) and one of first degree murder (Patricia Humphries), we have designated the latter as the victim for purposes of identification.

which indicated that the defendant had keys he wanted to return to the victim and that the victim was avoiding his phone calls.

Larry Humphries, the defendant's brother, testified that he traveled to 1586 Sidney Street on the afternoon of September 3, 2002, accompanied by the defendant, Ricky Cole, and Lawrence (Junior) Cole. Upon arrival, he observed a black Mercedes parked near the house, with Glenda Gipson in the driver's seat and the victim as the passenger. The defendant exited the vehicle, walked to the passenger side of the car, and started a "scuffle" with the victim, hitting the victim and tearing her clothes. As Ricky and Junior Cole attempted to restrain the defendant, the victim stated that she was going to kill the defendant. Humphries took the victim's purse, removed a gun from it, and threw the gun into nearby shrubbery. The defendant later broke free, retrieved the gun, and fatally shot the victim, who remained in the vehicle throughout the incident.

On cross-examination, Humphries testified that he had been at his sister Louise's home with the defendant, Ricky Cole, and Junior Cole before going to his sister Ernestine's home on Sidney Street. He reiterated that the defendant immediately got out of the vehicle and approached the open door on the passenger side of the Mercedes, where an argument between the victim and defendant ensued. He stated that he left the scene immediately after the shooting and gave a statement to police some time later. On redirect examination, Humphries testified that the defendant walked toward the victim as he fired.

Glenda Gipson testified that she and the victim were friends and that she drove her to Sidney Street on the day of the incident in her black 1991 Mercedes 300. She recalled that the victim phoned the defendant on the drive and that the car occupied by the defendant arrived at Sidney Street shortly after they did. Gipson stated that the victim asked for her keys when the defendant approached the car and that the defendant indicated he did not have them. The two then began to argue, and the defendant struck the victim with his fist. Gipson testified that Humphries took the victim's purse and removed her gun. The defendant, who eventually took possession of the weapon, went into the house briefly and came out shooting, fatally wounding the victim and injuring Gipson.

On cross-examination, Gipson testified that the defendant did not initially have a weapon and that she unsuccessfully attempted to restrain the defendant as he and the victim fought. She stated that Humphries went to the driver's side of the vehicle and took the victim's purse, went through it, and removed the gun. She further stated that Humphries took both the purse and the gun inside the house and that the defendant ran out of the house, firing and hitting the victim and Gipson. She stated that the defendant dropped the weapon after the shooting and that she used a shirt to pick it up and take it to a nearby house. After reviewing her statement to police, Gipson stated that the victim's leg was outside the car immediately before the shooting, which prevented her from driving away. She further reiterated that the weapon was dropped and was not thrown at her head, as her statement indicated.

Ricky Cole, the defendant's nephew, testified that he arrived at Sidney Street to find the defendant on the passenger side of the Mercedes "having a little fight" with the victim. He stated

that the defendant covered the victim's hand as she tried to pull the weapon out of her purse. Although he attempted to convince the defendant to release the victim, the defendant refused, insisting that the victim was going to shoot him. Upon Cole's instruction, Humphries went to the driver's side of the vehicle and took the victim's purse. When the defendant began biting the victim's ear, Cole was able to pull the defendant away from the victim. He then gave the victim her purse and shirt, which had been torn off, and asked her to leave. As the victim refused, the defendant came out of the house, "zoned out," and began shooting.

On cross-examination, Cole testified that the argument began when the defendant refused to give the victim her keys. He stated that he grabbed the defendant from behind in an attempt to restrain him and that he called for Humphries when he saw the victim's gun. Cole reiterated that the victim refused to leave after the initial incident was over and that the defendant came out of the house and began shooting as the victim got back in the car. Cole stated that the defendant left after the shooting and that he did not see what happened to the gun.

John Gordon testified that he lived at 3001 Mount Olive Street in September 2002, and that he observed the black Mercedes parked on Sidney Street on the day of the shooting. He recalled that he heard people arguing and saw someone fire three to four shots within close range of the vehicle. Gordon stated that Gipson, who had been shot in the arm, came to his residence after the shooting and that he helped her stop the bleeding and told her to put the weapon in the garbage can until the police responded. He further stated that he told the police where the gun was located when they arrived.

On cross-examination, Gordon testified that he went to the front door when he heard people arguing and that he saw Humphries trying to break up the fight. He then went to his brother's room to watch television but returned to the front door when he heard shots. Gordon stated that he saw the shooter fire and run and that the police responded shortly thereafter. He acknowledged that he did not see the victim pull the gun out of her purse but reiterated that he did witness the shooting.

Officer Rodney Askew of the Memphis Police Department testified that, upon his arrival to 1586 Sidney Street, he observed a black Mercedes parked in front of the house and several onlookers standing nearby. He stated that Gipson approached him and his partner and told them that she and the victim had been shot. When Officer Askew saw the victim lying across the front seat of the vehicle, he phoned paramedics and radioed for back-up to secure the crime scene. Gipson led Askew and his partner to Gordon's home, where they recovered the weapon, a .38 Smith and Wesson revolver, which contained four spent casings.

Sergeant Eric Freeman testified that responded to the dead on arrival (DOA) call and investigated the crime scene. He stated that the victim was lying across the seat of the car, with her purse and torn red T-shirt in the right floorboard. On cross-examination, Sergeant Freeman testified that he arrived shortly after 2:00 p.m. and that he took all of the photographs on the scene.

-3-

Sergeant T.J. Helldorfer, the case coordinator of the investigation, testified that he developed the defendant as a suspect after interviewing Gipson and other eyewitnesses. He stated that the defendant was not on the scene when he arrived and that he "[m]ade numerous attempts" to locate the defendant, including through NCIC notification and television news sources. Sergeant Helldorfer indicated that his investigation revealed that the defendant and victim were married but had been separated. Acting on a tip from the defendant's family, he was eventually able to locate the defendant in Little Rock, Arkansas.

Officer Jan Lee of the Little Rock Police Department testified that she received a call from the Memphis Police Department indicating that the defendant was located at 2019 Nichols Street in Little Rock. When she and an accompanying officer responded to the location, the defendant identified himself as Larry Walker. When asked his birth date, the defendant initially answered February 4, but immediately changed his answer to August 18, 1950. The defendant was transported to the police department for positive identification.

Lieutenant Scott Timmons testified that the defendant was transported to the police department, where photographs and fingerprints taken for comparison positively identified the subject in custody as the defendant. On cross-examination, Lieutenant Simmons testified that he found no identification of the defendant at the Nichols Street location.

Detective John Stafford testified that he interviewed the defendant at the Little Rock Police Department. Although the defendant again identified himself as Larry Walker, the defendant revealed his true identity after Detective Stafford informed him that they would take his fingerprints. Detective Stafford stated that the defendant refused to sign the waiver of rights form but made a "spontaneous statement" that "the incident in question had occurred during a family gathering and that his wife had pulled a gun on him, [and] there was a struggle and the gun went off." He indicated that he did not ask the defendant any questions, and that he was transported back to Memphis. On cross-examination, Detective Stafford testified that no one else was present when the defendant made the statement.

As the final witness at trial, Dr. Teresa Campbell testified that she worked as a forensic pathologist at the Regional Medical Examiner's Office in Memphis from July 2000 to February 2004. She stated that, upon analysis, she determined the cause of the victim's death to be multiple gunshot wounds. Dr. Campbell further noted that the victim had a bite mark on her right ear and that her blood was negative for alcohol and illegal drugs. On cross-examination, Dr. Campbell stated that an entrance wound can be distinguished based upon the condition of the skin, whether or not a bullet is found, or upon the condition of a bone. She further indicated that she recovered two bullets from the victim's body, both of which were "full metal jacket [and] medium caliber." Following the presentation of proof, the jury convicted the defendant of first degree premeditated murder and aggravated assault.

-4-

<u>Analysis</u>

I. Sufficiency

The defendant first contends that the evidence is legally insufficient to establish that he acted with premeditation. The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," <u>State v. West</u>, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." T.C.A. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." <u>Id.</u>

The element of premeditation is a question of fact to be determined by the jury. <u>State v. Suttles</u>, 30 S.W.3d 252, 261 (Tenn. 2000). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. <u>State v. Bland</u>, 958 S.W.2d 651, 660 (Tenn. 1997); <u>State v. Bordis</u>, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including: declarations of the intent to kill; procurement of a weapon; the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; infliction of multiple wounds; the making of preparations before the killing for the purpose of concealing the crime; failure to render aid to the victim; destruction or secretion of evidence; and calmness immediately after the killing. <u>State v. Nichols</u>, 24 S.W.3d 297, 302 (Tenn. 2000); <u>State v. Lewis</u>, 36 S.W.3d 88 (Tenn. Crim. App. 2000).

Although the time between the initial encounter and the shooting was relatively short, there is significant circumstantial evidence that, when taken in a light most favorable to the State, establishes that the defendant acted with premeditation. The evidence establishes that the defendant used a deadly weapon, specifically a .38 Smith and Wesson revolver, on the unarmed victim. We further note that the initial encounter was diffused with the aid of the defendant's friends and that the defendant went into the house briefly. When he exited, he ignored the admonitions of his friends and walked aggressively toward the victim, firing multiple rounds at her. Although multiple gunshots are not alone sufficient to support the element of premeditation, <u>State v. Brown</u>, 836 S.W.2d 530, 542 (Tenn. 1992), in our view, this fact, taken together with the defendant's conscious disregard of his friends' requests, supports the conclusion that the defendant exercised reflection and judgment before fatally shooting his wife. <u>See</u> T.C.A. § 39-13-202(d).

The testimony further establishes a cool and calculated demeanor after the fact, as the defendant immediately left the scene, failing to render aid to the victim, and evaded police for almost a year after the shooting. For these reasons, we conclude that sufficient circumstantial evidence existed to establish the element of premeditation.

## II. Consecutive Sentencing

Second and finally, the defendant challenges the imposition of consecutive sentences. Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria applies:

(1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).

If the court concludes the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are unnecessary for the other categories of Tennessee Code Annotated section 40-35-115(b). State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court found made the following findings of fact at the conclusion of the sentencing hearing:

All right. Well, based on his prior record, he is, clearly, Range II; and based on his prior record and the number of convictions and the types of convictions, I think without any Blakely problems, whatsoever, he can be sentenced to a ten-year sentence as a Range-II offender for this aggravated assualt.

I'm also going to run this consecutively to the life sentence he received for the murder given his extensive criminal history, which is reflected in the presentence report that's part of this record.

And given his absence of any other meaningful means of employment, it appears to me that his criminal endeavors - his bank larcenies, the robberies, and the uttering forged papers and the thefts of property and the grand larcenies - petit larcenies, they were the types of offenses that would have been committed for the purpose of providing himself with his major source of livelihood.

And, I think, clearly, the facts of the case would bear out the fact that he would be a dangerous offender as well.

But I think Factors 1 and 2 are clearly present and are matters that can be gleaned straight from his prior record without any further conclusions necessary.

Ten years, Range II, consecutive to his life sentence. Step out.

We initially note that the defendant has failed to include the presentence report in the record on appeal. It is well-settled that it is the duty of the accused to provide a record that conveys a fair, accurate, and complete account of what transpired with regard to the issues that form the basis of the appeal. Tenn. R. App. P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Certainly, the presentence report is vital in appellate review of the trial court's imposition of consecutive sentencing; therefore, in its absence, we presume the accuracy of the trial court's findings. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Although the trial court did not make the requisite findings to determine the defendant was a dangerous offender, we conclude that the defendant's status as a professional criminal and his prior criminal history certainly constituted a sufficient basis to sentence him consecutively. With respect to these factors, the trial court particularly noted the defendant's lack of "meaningful means of employment" and multiple convictions for larceny, robbery, forgery, and theft. Taking the court's findings as accurate, we agree that the defendant's prior criminal record is extensive and that his work history, coupled with the types of offenses he has committed, establishes him as one whose livelihood is derived from criminal behavior. It is necessary to find only one of the statutory categories listed in section 40-35-115(b) to support the imposition of consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Therefore, we conclude that the trial court did not abuse its discretion in sentencing the defendant consecutively, and we affirm the imposed sentences.

## Conclusion

Based upon the foregoing, we affirm the convictions and sentences imposed by the Shelby County Criminal Court.

_____
JOHN EVERETT WILLIAMS, JUDGE